Filed 11/19/24

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| MARLON QUESADA, | B326986 |
| Plaintiff and Appellant, | Los Angeles County Super. Ct. No. 21STCP00902 |
| v. | |
| COUNTY OF LOS ANGELES et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, James C. Chalfant, Judge.  Affirmed.

Rains Lucia Stern St. Phalle & Silver, Jacob A. Kalinski and Brian P. Ross for Plaintiff and Appellant.

Hausman & Sosa, Jeffrey M. Hausman, Larry D. Stratton, and Vincent C. McGowan for Defendants and Respondents.

———————————

Marlon Quesada was a "mediocre employee," according to a commander in the Los Angeles County Sheriff's Department. As a deputy sheriff, Quesada "did not have the best work ethic." The commander wrote there was "nothing striking" about Quesada. Quesada sued when the Department did not promote him. He claimed the Department improperly considered a disciplinary proceeding against him that had been terminated by a statute of limitations. The Department rejected Quesada's claim, as did the trial court.

Quesada appeals, asserting the trial court erred by failing to apply a burden-shifting approach to his claim. We decline Quesada's invitation to change the law by adopting burden-shifting in this context. Instead, the standard approach to civil litigation governs here: plaintiffs bear the burden of establishing the elements of their claim by the relevant standard, which here is a preponderance of the evidence. Quesada's policy arguments do not justify his proposed departure from this norm.

We likewise reject Quesada's substantial evidence attack on the trial court's ruling, and we affirm in all respects. Undesignated citations are to the Government Code.

I

Quesada was a longtime deputy sheriff with a mixed record.

A

Quesada joined the Department in 1995 and worked in the Transit Services Bureau.

The Department suspended Quesada twice for misconduct: once in 1999 and again in 2012.

In 2015, the Department launched another administrative investigation into Quesada's conduct. That event is central to

2

this dispute.  According to the Department's Performance Recording and Monitoring System Report, the investigation addressed Quesada's alleged "failure to make statements," his "fraternization," and his "general behavior."

The 2015 investigation concerned allegations Quesada fraternized with someone transporting money or drugs; Quesada may have been holding money for this person.

The Department put Quesada on administrative leave during this investigation.  In 2017, the Department notified Quesada of its intent to discharge him.

Quesada then filed his first petition for a writ of mandate against the Department.  Quesada invoked subdivision (d) of section 3304, which sets a one-year limitations period for investigations of police officers.  He contended the Department sent its notice 91 days after the statute of limitations expired.  The trial court agreed and enjoined the Department from continuing disciplinary action relating to that investigation.

In response, in 2017 the Department, to use its jargon, "inactivated" this investigation of Quesada.  The Department designated a case as "inactivated" when, among other reasons, it was closed due to a statute of limitations.  The label "inactivated" did not mean Quesada was either guilty or not guilty of the charge.  The Department reinstated him as a deputy sheriff.

After Quesada's return in 2017, former Transit Services Captain Karl Schow and Operations Lieutenant Tanya Clark told Quesada he was being loaned temporarily to the Fleet and Communications department.  Quesada claimed Schow and Clark were happy to have him back in Transit Services, and Schow felt "bad" and "terrible" about Quesada's temporary assignment to Fleet and Communications.

Quesada reported to Fleet and Communications Commanding Officer Captain Eli Vera. Quesada described a discussion with Vera as follows. Vera said, "Look, I don't know what you did. I don't care. I've been in trouble." And I asked him, "Well, why am I here? I don't understand. You know, I shouldn't be here." And, to my recollection, Captain Vera replied, "Look, trust me. I've been on the department a long time. I've been in trouble. You come. You do a good job. And you'll be fine."

According to the Department, Quesada's assignment to Fleet and Communications was appropriate for a deputy returning from a release from duty and not cleared to interact with the public. Quesada spent about three weeks at Fleet and Communications before taking an additional authorized absence from May to August 2017.

About this time, Quesada tried to bid for a Transit Services car, but the Department would not permit a deputy assigned to Fleet and Communications to make this bid. Quesada filed a grievance in May 2017, which the Department approved in November 2017 upon his return to Transit Services.

While on administrative leave pending the investigation in June 2017, Quesada submitted an additional grievance because the Department did not notify him of a sergeant promotional examination. The Department denied this grievance.

B

We describe the Department's promotion process.

Candidates seeking the rank of sergeant took a written examination and participated in an interview. The Department scored and sorted candidates into bands. Band one was the

4

highest. The Department compiled the applicants into a publicly available eligibility list.

Exam results were not the sole factor in the promotion process. The Department also considered a candidate's "background, brea[d]th of experience, training, and the performance record." The Department likewise evaluated the length, type, and amount of past discipline. Thus, the Department might choose someone in bands two or three over a band one candidate due to "performance, personal characteristics, and other work related criteria and merit factors." This approach reflected the Department's view that the rank of sergeant denoted a frontline supervisor, and supervisors must possess integrity, judgment, experience, and abilities beyond good test taking skills.

After compiling the eligibility list, the Department assembled a Commanders Panel to review proposed candidates for promotion.

Panel members signed a mandatory confidentiality agreement. They could not make notes or use email during the meetings. The parties have not included these confidentiality agreements in the record. We do not know, for instance, whether the agreements included exceptions for subpoenas to testify in legal proceedings.

Members of the Commanders Panel had access to the candidates' profile sheets, demographic sheets, candidate lists, the Performance Recording and Monitoring System Report, and other limited information.

A member of the Personnel Administration Bureau attended promotion meetings to ensure discussions were appropriate and everyone complied with procedures and

restrictions. This member's job was to prevent panel members from considering invalid or inappropriate information.

C

Quesada took the sergeant's examination in 2017. His 93.38% score put him in band two. Of the 421 candidates who took the 2017 examination, Quesada was one of 85 in band two. The Department did not promote him to sergeant. The panel had Quesada's report, which showed the Department had "inactivated" its last investigation of him.

Quesada took the sergeant's examination again in 2019 and scored a 95.72%, which placed him in band one. Out of the 484 deputies who took the 2019 exam, 13 were in band one.

As was typical, the panel gathered promotion recommendations from Department management.

Acting Captain Chris Mouat was a 28-year veteran in the Department. Quesada served under Mouat, the Operations Lieutenant, from 2013 to 2020.

Mouat evaluated Quesada's performance in 2016 and 2017 as "Competent."

In descending order, the possible grades were Outstanding, Very Good, Competent, Improvement Needed, and Unsatisfactory.

For the year following August 2019, a different evaluator, John Burcher, rated Quesada overall as "Very Good." Quesada was merely "Competent," however, in five subcategories:

- "amount of work performed";
- "written expression";
- "orderliness in work";
- "compliance with work instructions"; and
- "performance in emergencies."

6

Quesada never won an "Outstanding" rating in any of the 21 subcategories.

Burcher had views about Quesada. Burcher had 31 years of experience with the Department and had achieved the rank of commander. In 2019, Burcher was captain of Transit Services when Quesada returned from an extended absence in August 2019.

Burcher knew of the Department's 2015 investigation of Quesada because he spoke about it with Mouat in 2019. Mouat told Burcher about the 2015 investigation, but Burcher did not care about that information because he believed it had no relevance. "And having been the subject of that before, I really adhere to my morals which is -- if the case is not been proven, I don't consider it."

For other reasons, Burcher said Quesada did not have the skills and qualities for a sergeant. Burcher's reasons were that Quesada was "generally a mediocre employee" who "did not have the best work ethic." When Burcher recommended five Transit Services officers for promotion, Quesada was not one of them.

Quesada failed the 2021 sergeant's exam, but he claimed he did so intentionally. He testified he "deliberately" wrote the wrong answers on the test. Quesada has not explained this puzzling statement.

D

Quesada filed a second petition for writ of mandate in the trial court in March 2021. This petition sought to compel the Department to promote him to sergeant and to give him back salary and interest, a civil penalty of $25,000 for each legal violation, actual damages, and attorney's fees and costs.

Quesada alleged the Department used the 2015 time-barred investigation against him during the promotional review process.

In a 27-page single-spaced opinion, the trial court denied Quesada's petition. The court rejected Quesada's argument that a burden-shifting test should apply and held Quesada's evidence did not establish the Department's decision was illegal.

Quesada appealed.

## II

Quesada claims the Department violated his rights by taking account of the discipline investigation the Department took too long to complete. He contends a burden-shifting test applicable to race and other discrimination claims should govern this claim. He also argues that, in any event, substantial evidence does not support the trial court's decision. We affirm.

## A

We review pertinent law.

Quesada filed a petition for a traditional writ of mandate under section 1085 of the Code of Civil Procedure.

This petition is a legal tool to compel a public agency to perform a legal duty. The trial court reviews an administrative action to determine whether an agency's action was arbitrary, capricious, entirely lacking in evidentiary support, contrary to established public policy, or unlawful. The court also examines whether the agency's procedures were fair and proper. Mandate exists to correct abuses of discretion. In determining whether an agency has abused its discretion, the court must not substitute its judgment for that of the agency. If reasonable minds may disagree, the court will uphold the agency's determination. (*Munroe v. Los Angeles County Civil Service Com.* (2009) 173 Cal.App.4th 1295, 1300.)

8

To obtain this writ, the burden is on the petitioner to show that there was no other plain, speedy, and adequate remedy, that the agency had a clear duty to act in a particular way, and that the petitioner had a beneficial right to performance of that duty. (*California Privacy Protection Agency v. Superior Court* (2024) 99 Cal.App.5th 705, 721.)

Our review of factual matters is deferential, but we independently review questions of law. (See *Tansavatdi v. City of Rancho Palos Verdes* (2023) 14 Cal.5th 639, 652.)

B

Quesada's main argument is purely legal: the trial court failed to adopt a burden-shifting approach to his case. Rather obliquely, Quesada confesses he is asking this court to break new legal ground.

The customary approach to civil litigation is that plaintiffs begin with, and retain, the burden of proving the elements of their claim by the governing standard of proof, which here is a preponderance of the evidence. The trial court used this customary approach.

Quesada wants a procedure more favorable to plaintiffs like him. He asks us to import a burden-shifting approach from *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792, 802 (*McDonnell Douglas*).

*McDonnell Douglas* concerned the federal Civil Rights Act of 1964. The court held that, under that statute, the plaintiff must carry the initial burden of establishing a prima facie case of racial discrimination. Plaintiffs do so by showing:

1. they belong to a racial minority;
2. they applied and were qualified for a job for which the employer was seeking applicants;

9

3. the employer rejected them; and

4. after the rejection, the position remained open and the employer continued to seek applications from others with plaintiffs' qualifications. (*McDonnell Douglas, supra*, 411 U.S. at p. 802.)

Once a minority plaintiff offers this evidence, the *McDonnell Douglas* procedure shifts the burden of production to the employer to articulate some legitimate and nondiscriminatory reason for rejecting the employee. (*McDonnell Douglas, supra*, 411 U.S. at p. 802.) If the employer does so, the burden shifts back to the plaintiff to show this stated reason for rejection was in fact pretext: a coverup for a racially discriminatory decision. (*Id.* at pp. 804–807.)

The burden shifting process under *McDonnell Douglas* involves the burden of *production*. The burden of *persuasion* always remains with the plaintiff. (*Texas Dept. of Community Affairs v. Burdine* (1981) 450 U.S. 248, 253–256.) "It is important to note . . . that although the *McDonnell Douglas* presumption shifts the burden of production to the defendant, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.' " (*St. Mary's Honor Center v. Hicks* (1993) 509 U.S. 502, 507.)

The Supreme Court of the United States explained the powerful reason for adopting this burden-shifting approach. "[T]he purpose of Congress [was] to assure equality of employment opportunities and to eliminate those discriminatory practices and devices which have fostered racially stratified job environments to the disadvantage of minority citizens." (*McDonnell Douglas, supra*, 411 U.S. at p. 800.) The Civil Rights

10

Act "tolerates no racial discrimination, subtle or otherwise." (*Id.* at p. 801.)

The California Supreme Court adopted *McDonnell Douglas*'s burden-shifting approach because of the similarity between California and federal employment anti-discrimination laws. (*Guz v. Bechtel Nat. Inc.* (2000) 24 Cal.4th 317, 354 (*Guz*).)

The *McDonnell Douglas* approach has no basis in this case. Quesada is not claiming the Department discriminated against him on grounds of race or because he belongs to a historically oppressed and disfavored group. This is not a race case, and it is not akin to a race case.

Rather, Quesada claims the Department took too long to complete his discipline investigation but later, when evaluating him for promotion, considered that investigation anyway, which was improper. That is his only claim of discrimination.

The concerns that motivated the *McDonnell Douglas* rule are absent here. Quesada has framed his suit to place himself, not as a member of a historically oppressed and disfavored class, but as a law enforcement officer seeking a supervisory promotion. This group is not historically powerless. Quesada has not claimed the political process has shut out law enforcement officers or deprived them of a voice in government. (Cf. *Pasadena Police Officers Assn. v. City of Pasadena* (1990) 51 Cal.3d 564, 572 (*Pasadena Police*) [peace officers have been held to a higher standard than other public employees, in part because they alone are the guardians of peace and security of the community, and the efficiency of our whole system, designed for the purpose of maintaining law and order, depends upon the extent to which such officers perform their duties and are faithful to the trust reposed in them].)

The wrong Quesada claims–that the Department used the inactivated investigation against him–is not analogous to the wrongs suffered by historically oppressed and disfavored groups.

Quesada argues he faces difficulties in proving his case, which shows we should adopt the *McDonnell Douglas* approach here. The difficulties he highlights are the confidentiality agreements signed by the members of the Commanders Panel. Quesada maintains these agreements bar his ability to find out what the panel members did and did not discuss, thus harming his ability to build his case.

Three difficulties plague this argument.

First, Quesada did not attempt to subpoena or to discover information from the members of the Commanders Panel who decided against him. The trial court noted Quesada did not seek to compel discovery on this issue. Quesada can hardly use his lack of discovery effort as a justification for changing the law. We offer no view on the Department's position that its confidentiality agreements must trump every effort of a court system to discover the truth, for the parties have not briefed this large question. (Cf. *County of Riverside v. Super. Ct.* (2002) 27 Cal.4th 793, 803–804 [citing statutory and privilege doctrines]; *Pasadena Police, supra,* 51 Cal.3d at p. 580 [same].)

Second, Quesada had ample access to circumstantial evidence, which can weigh decisively in a plaintiff's favor. It is common for plaintiffs to make a winning case strictly on circumstantial evidence. It takes the right facts, of course, and it is a drawback if there are many other credible explanations for a failure to promote, like the fact the employee is merely mediocre. The notion that limiting a case to circumstantial evidence means plaintiffs cannot win is incorrect.

12

Third, the public has a powerful interest in excellence in policing. Police management must be able to fire bad officers and to refuse to promote mediocre ones, because peace officers enjoy extraordinary powers over the general public. Law enforcement departments must be able to exercise reasonable discretion over personnel decisions, free from the threat of unwarranted litigation by those disappointed by management discretion. Quesada's proposal would not serve this public interest. (Cf. *Pasadena Police, supra,* 51 Cal.3d at pp. 568–569 [describing "the public interest in maintaining the efficiency and integrity of its police force, which, in enforcing the law, is entrusted with the protection of the community it serves"], *id.* at p. 577 [reiterating importance of "preservation of public confidence in the trustworthiness and integrity of its police force"], *id.* at p. 578 [same].)

Quesada cites *Lawson v. PPG Architectural Finishes, Inc.* (2022) 12 Cal.5th 703 (*Lawson*), which is not germane. In *Lawson*, the California Supreme Court ruled the *McDonnell Douglas* burden-shifting framework does not apply to whistleblower retaliation claims brought under the Labor Code. Rather, courts in whistleblowers cases should apply the framework prescribed by Labor Code section 1102.6. (*Id.* at p. 707.) Labor Code section 1102.6, however, does not apply to this case, which is not a whistleblower case and which lacks a statutory specification similar to this provision. *Lawson*'s holding is not pertinent.

C

Quesada argues no substantial evidence supports the decisions by the Department and the trial court. But superiors rated Quesada as mediocre. As far as the record shows, in the

13

years since 1995, Quesada *never* achieved the top grade of "Outstanding" in any evaluation.  The Department suspended Quesada twice for misconduct, apart from the inactivated investigation.  There is more, but this substantial evidence suffices.  Quesada has points in his favor, of course, but we cannot reweigh the evidence.  (See *Perez v. Galt Joint Union Elementary School Dist.* (2023) 96 Cal.App.5th 150, 168 [summarizing substantial evidence standard].)

## DISPOSITION

We affirm the judgment and award costs to the respondents.

WILEY, J.

We concur:

STRATTON, P. J.

VIRAMONTES, J.

14